HILARY POTASHNER (Bar No. 167060)
Federal Public Defender
JENNIFER J. UYEDA (Bar No. 238602)
(E-Mail:  Jennifer_Uyeda@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081

Attorneys for Defendant
JULIO CARO

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 16-CR-489-GHK |
| Plaintiff, | **POSITION RE SENTENCING; EXHIBITS** |
| v. | |
| JULIO CARO, | **Sentencing Date:  November 7, 2016** |
| Defendant. | **Sentencing Time: 11:00 a.m.** |

Defendant Julio Caro, by and through his attorney of record, Deputy Federal Public Defender Jennifer J. Uyeda hereby submits his position regarding sentencing.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED:  October 21, 2016

By  */s/ Jennifer J. Uyeda*

JENNIFER J. UYEDA
Deputy Federal Public Defender
Attorney for JULIO CARO

# **TABLE OF CONTENTS**

Page(s)

I. INTRODUCTION ............................................................................... 1

II. THE PRESENTENCE REPORT AND RECOMMENDATION .............................. 2

III. THE APPROPRIATE SENTENCE ................................................... 3

    A.    Personal History -- Giving the Gift of the Value of Education ................. 3

    B.    Professional History -- Building a Reputation of Excellence.................... 5

    C.    The Business Partnership with Yucaipa............................................. 8

    D.    Cooperation and Extraordinary Acceptance of Responsibility................. 14

    E.    Post-Offense Rehabilitation ...................................................... 17

    F.    Just Punishment and Sentencing Options --Adverse Effect on Mr.
            Caro's Life --- Both Personal and Professional ........................... 18

IV. CONCLUSION ............................................................................ 22

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Gall v. United States,*
   552 U.S. 38 (2007)................................................................................. 17

*United States v. Brown,*
   771 F.3d 1149 (9th Cir. 2014) ............................................................ 14

*United States v. Brown,*
   985 F.2d 478 (9th Cir. 1993) .............................................................. 16

*United States v. Green,*
   152 F.3d 1202 (9th Cir. 1998) ............................................................ 17

*United States v. Lloyd,*
   807 F.3d 1128 (9th Cir. 2015) ............................................................ 14

*United States v. Lyons,*
   472 F.3d 1055 (9th Cir. 2007) ............................................................ 14

*United States v. Patillo,*
   817 F.Supp. 839 (C.D. California 1993) ............................................ 13

*United States v. Tzoc-Sierra,*
   387 F.3d 978 (9th Cir. 2004) .............................................................. 17

*United States v. Ward,*
   814 F. Supp. 24 (E.D. Virginia 1993) .................................................. 8

*United States v. Woods,*
   335 F.3d 993 (9th Cir. 2003) .............................................................. 14

*United States v. Zolp,*
   479 F.3d 715 (9th Cir. 2007) .............................................................. 14

## SENTENCING POSITION

### I.      Introduction

> My daughter Isabel and son Javier sat on opposite sides of my sofa. I struggled to find my voice. I opened by saying that I had important news to share with them. I immediately told them it was not regarding my health. I paused; looked them both in the eye and told them that I had committed a crime. The air in the room was gone; my heart was beating loudly in my ears; and I could see both kids struggling to understand. So I had to keep going. I described the crime. I told them I was to be arrested and that I was pleading guilty. I gave them full detail. I needed them to be fully informed. I told them that I was deeply, deeply sorry; they too were victims. Never did I pause before making the mistake and contemplate that they too would be victims. Indeed, my judgment had been severely impaired to put them at risk and that I was deeply sorry. I asked them to work with me over time to find respect for me again; perhaps we will never be the same, but I explained that my love for them was deep and that I was committed to some form of redemption with them. I know it will take time and hard work, and I will need to reset my goals. But I will place them first and with time find fatherhood again.

(Julio Caro Letter, attached as Ex. A.)

Mr. Caro has always raised his children to be responsible and accountable for their actions. Putting his own teachings into action, Mr. Caro, long before this case was brought to the federal authorities, confessed and cooperated with executives at Yucaipa Initiatives in 2014. And since that time, Mr. Caro has enacted his remorse. He accepted responsibility for his conduct, pled guilty early and quickly, and has been waiting for this day to come for the last two years. It was important to him, no matter how much it broke him, to fully admit to his children how he failed to manage his finances, how he stole what was not his, and how he did not ask for help. He did so without excuses, with courage, and with a vulnerability that one hopes never to see from a parent. Even in his darkest hour, Mr. Caro set aside his pride and focused on how his children could learn from his failure, "a teaching moment for a life lesson," potentially one of the unexpected greatest gifts he could bestow on his children. (*Id.*) He believed that no matter how heartbreaking it would be to see a father figure fall from grace, if his children could see "someone who they love and admire confess to

1

committing a crime and placing them at risk, [he] would show them that by owning it, and not seeking to hide behind excuses, [he] would be able to move on and rebuild [his] life both as a father and a professional." (*Id.*)

Mr. Caro's discussion with his children demonstrates one reason why imprisonment is not necessary to deter him from future criminal conduct. His conduct, while certainly egregious, was an aberration from his otherwise productive and law-abiding life for over fifty years. As set forth below, Mr. Caro, as a film producer for over 30 years, made significant strides in diversifying a Caucasian male dominated industry by producing movies with Latin characters and stories, employing many people of color and women as cinematographers, grips, directors behind the camera, and mentoring and teaching young Latin film students. He partnered with Yucaipa and made films with them for nearly five years. Over the last several years, Mr. Caro has started to rebuild his life both with his family and in the industry.

The defense respectfully requests that a three year period of probation, 300 hours of community service, and an 18-month term of home confinement is sufficient but not greater than necessary to reflect the seriousness of his criminal conduct while enabling him to work, make restitution, support his children, and provide a valuable and unique service to the community.

## II.    The Presentence Report and Recommendation

On October 3, 2016, the United States Probation Office ("USPO") timely disclosed the Presentence Report ("PSR"). The PSR calculates an advisory guideline range of 30 to 37 months, based on a total offense level of 19 and a Criminal History Category of I (PSR ¶¶ 3,7.) The probation office recommends a term of imprisonment of 12 months with six months in a residential reentry center during a three-year period of supervised release. (USPO Ltr. at 3.) This recommendation is in part based on Mr. Caro's early acceptance of responsibility "prior to any involvement with law enforcement," his criminal conduct as "uncharacteristic considering his otherwise

productive and stable law-abiding life for over fifty years," and the collateral punishment. (*Id*. at 4-5.)

The defense does not object to the calculation of the advisory guidelines. The defense, however, asks this Court to accept the parties' recommendation of an additional four-level *Booker* variance.

## III.    The Appropriate Sentence

### A.    Personal History -- Giving the Gift of the Value of Education

The value of education was of utmost importance throughout three generations of Mr. Caro's family. It started with his mother, Sona Olson, who single handedly raised her two young boys, Julio and Marcos, on the Yale University campus, an environment rich with quality facilities and education. Ms. Caro's mother worked as a research assistant in the Sociology Department at Yale University and later became the first woman as the Manager of Custodial Services. (PSR ¶ 47.) She often referred to herself as the "queen of janitors." Since the age of fifteen, Mr. Caro cleaned dormitories, did custodial work, and served as the Research Assistant in his dormitory. (PSR ¶ 48.) They were "brought up in a lower middle class household always tight on money with [their] mother doing a lot to define the future for [them]." (Marcos Caro Letter, attached as Exhibit B.) Mr. Caro's mother's "simple mandate" in raising her sons was for them to "have an excellent college education that would prepare them to be responsible, happy and secure in both their personal and professional lives." (Sona Olson Letter, attached as Exhibit C; PSR ¶ 49.) Mr. Caro graduated from high school in 1977 and attended Cornell University, earning a Bachelor of Arts degree in philosophy and a minor in theater arts in 1981. (PSR ¶¶ 65-66.) After college, he became a banker at Manufacturers Hanover Trust (now JPMorgan Chase), specializing in secured lending for the textile and apparel industries. (PSR ¶ 50.)

Raised with this strong value of education, Mr. Caro, in turn, stressed that with his two children, Isabel and Javier. Mr. Caro and his now ex-wife strove to provide the most advantageous education they believed they could afford. Isabel Caro, their oldest

3

child, attended Brentwood High School, and is currently a student at Cornell University majoring in government with an eye toward pre-law.  Starting this fall, their son, Javier Caro, transferred from Viewpoint private school to the local public high school due to this case.  His daughter Isabel writes:

> My father taught me that education is the most important gift a parent can give to their child.  He made the effort to provide me with that gift throughout my life.  My dad made me realize that boredom is a self-inflicted wound because we have the choice to get up and do something that makes us happy or challenges us, or both!  My dad also showed us the significant value of hard work by recognizing the work that others did.  On the way to school we would pass the same construction site and he mentioned how every day we could see their progress, and that was admirable work.

(Isabel Caro Letter, attached as Exhibit D.)

In addition to their scholastic education, Mr. Caro believed that learning about diversity and people was equally important.  Mr. Caro realized that his children only saw a small sliver of life in Santa Monica.  He started taking his children on local adventures so they could see "what's out there in the world."  It started when they were toddlers and continued until they were young adults.  On weekends, the adventure started with a local walk and then on buses and trains with no end or goal in mind.  They saw landmarks, and the diversity of culture and people coming from other socio-economic circumstances; they discovered neighborhoods and parks.  In Mr. Caro's words, "life slowed down and all that matter was hanging out."  (Ex. A.)  Because Mr. Caro came from a humble beginning, he did not want his children to lose sight of their roots despite the privileges they now had.  He did not want his children to be consumed in materialism or live a celebrity lifestyle like many of those who surrounded him at work in the industry. (*Id.*)  These efforts are just one example of Mr. Caro's grounded perspective about his life and his community, and his desire not to raise sheltered or privileged children who are disconnected from the world.

Despite his intense work schedule, Mr. Caro was a very involved, loving, and supportive father, without being overbearing.  As his ex-wife, Jacqueline Caro, writes:

4

> [B]eing a father is [Mr. Caro's] greatest accomplishment that gives him the most pride as a man. . . . He participated in their routine by giving baths at night, reading bedtime stories, taking late night stroller walks and aimless car rides for sleep time when they were little. . . . He attended the holiday sing, flute performance, horse show, the hip hop dance routine, poem readings, baseball games, and soccer practice throughout the years. Let's say everyone at school knew Isabel and Javier's dad.

(Jacqueline Caro Letter, attached as Exhibit E.)  Mr. Caro even read Homer's Odyssey to Isabel at bedtime when she was 12 years old.  (Ex. A.) His mother describes him as "completely and utterly devoted to his children" and that his children "are the center of his universe."  (Ex. C.)  She writes in her letter:

> [Mr. Caro] never allowed his work in the entertainment business to diminish his attention to their well-being and he spent as much time as possible sharing both cultural and environmental experiences with them, such as attending sporting and musical events.  In short, he could not be a more caring, thoughtful, loving father.

(*Id*.)

## B.   Professional History -- Building a Reputation of Excellence

For 30 years, Mr. Caro built a reputation of excellence in the film industry which was his love and his passion.  Since he was 11 years old and saw "Butch Cassidy and the Sundance Kid" and the musical, "The Man From La Mancha," he was enamored with the stories, the actors, the storytelling, and the productions.  He minored in theater at Cornell and dreamed of being a theater director in New York.  As his mother describes him, "[h]e was known among his peers as an effective and creative leader with a passion for the arts and theater in particular." (Ex. C)  During the summer after graduating, he directed plays at Cornell and Ithaca Colleges.

After a four year stint in the banking industry, in 1985, Mr. Caro left Manufacturers Hanover Trust to re-pursue his passion for the entertainment industry. (PSR ¶ 51.)  He produced his first movie called "Necessity" followed by his second movie, "Siesta" in 1987.  In 1996, he joined Radical Media, the leading producer of

commercials and worked there for 4 years.  In 2000, Mr. Caro got his first break and met Jennifer Lopez while producing the movie, "The Cell."  Also, in 2000, he met Ronald Burkle's partner in Absolute Entertainment and produced the movie, "Three Strikes."  (PSR ¶ 52.)  In 2003, Mr. Caro joined Jennifer Lopez to produce "Nuyorican."  From 2005 to 2012, with Mr. Burkle, Mr. Caro produced "Homie Spumoni" starring Whoopie Goldberg and "El Cantante" starring Jennifer Lopez. While "El Cantante" was not a commercial success, it was often cited for its authenticity of casting and story-telling, and provided Mr. Caro with a remarkable visibility within the Latino entertainment culture.  It was also the highest budget Latino movie produced to that date.  Writers, directors, producers, production company owners, and artists attest to his hard work ethic, his politeness, sense of empathy, commitment, candor, honesty, and humility.  (*See* Exhibits F-K.)  A former business partner, John Baldecchi writes:

> [Mr. Caro] had to fight for everything that he had in life.  His success was based on his smarts and his focus to succeed.  It is very difficult to maintain position in the entertainment business. Very difficult.  And pivoting is hard to do.  You fall out of favor easily and people in power go out of their way to make things difficult on you in the process.
>
> In my line of work I hear, almost exclusively why people are so amazing and that they are good at everything.  And generally people like to project that they have perfect lives. [Mr. Caro] was not like that at all -- very down to earth and honest about himself.

(John Baldecchi Letter, attached as Exhibit F.)

Each time Mr. Caro produced a movie, on average, he employed approximately 150 to 200 people.  Mr. Caro also promoted and advanced diversity in an industry comprised of writers, directors, actors, and executives making strategic decisions who are predominantly Caucasian males.  For example, as an active member of the Latin community and a producer of entertainment content, Mr. Caro sought opportunities within the Latin cultures for the development and production of the content, including the writing, directing, and acting talent.  He hired as many people of color and women

6

to work behind the camera.  (PSR ¶ 53.)  He speaks at small community level artistic organizations including the National Association of Latino Independent Producers, the Directors Guild's Latin Caucus, and local theater groups with a Latin Membership. (*Id*.)  He has been a guest speaker at the University of North Carolina at Chapel Hill, New York University, Columbia University, and Cornell University, as well as a leader in the NALIP's mentor program helping Latino writers and directors develop their projects.  (*Id*.)  One of his mentees, Erika Bagnarello, now a screenwriter and director from Costa Rica, describes the impact Mr. Caro has had on her professional development:

> From day one, I articulated my goal of creating a body of work that reflects stories that touch on the essence of the human struggle and deliver a message of hope.  I can truly say that he has been there all the way for me, helping me in this mission by sharing his resources and experience.  [Mr. Caro] is a committed, collaborative and exceptional producer. He's a reliable person, dedicated and encouraging when times get difficult.

(Erika Bagnarello Letter, attached as Exhibit K.)  Another producer, David Maldonado, wrote:

> When many were unwilling to give the genre an opportunity, [Mr. Caro] pushed hard to break the genre.  [Mr. Caro's] tenacity and hard work gave life to many young artists who otherwise would have ended up in trouble or squeaking out meager lives for themselves.  I would dare say he has inspired many young men and women who are now finding their calling in the film industry .

(David Maldonado Letter, attached as Exhibit J.)

By the time Mr. Caro met Mr. Burkle, Mr. Caro's career as a producer was firmly established.  He had a reputation for being a solid executive overseeing production, having produced or executive produced 10 feature films, including "The Cell" which was his break through studio film.  He had also overseen the production of

7

commercials at a leading company.  While his earnings were unstable,[1] Mr. Caro averaged $200,000 a year.  This long and proven track record of committed employment, demonstrates positive character traits, and shows a propensity for living within the law and being a constructive member of society.  *See United States v. Ward*, 814 F. Supp. 24 (E.D. Virginia 1993) (court departed downward for defendant who had led a relatively crime-free life.)

### C.   The Business Partnership with Yucaipa

Mr. Caro and his company Broken Rose Productions, Inc. ("Broken Rose"), partnered with Mr. Burkle and his company Yucaipa Corporate Initiatives Fund I, LP ("Yucaipa"), in a joint venture to produce a series of independent films.  Together they formed R-Caro Productions, LLC ("R-Caro").  (PSR ¶ 11.)  After the films were produced, Warner Brothers sent a number of royalty checks to Mr. Caro for R-Caro to which Yucaipa was entitled as the majority shareholder and investor.  Mr. Caro transferred those funds to his personal corporation, Broken Rose, and spent them on various expenses associated with his life and Broken Rose.[2]  Mr. Caro agrees that the actual loss is $1,487,529.  (PSR ¶ 7.)

To put Mr. Caro's misconduct in context, a brief background of the industry, this joint venture and his role are necessary.  Ordinarily, when an independent film is produced and sold, there are three phases:  (1) the physical production of the film, which includes the actual filming; (2) post-production, which includes film-editing and

---

[1]   As a film producer, Mr. Caro did not receive a steady monthly income. Rather, earnings were paid in lump sums and often after production costs were paid.

[2]   While Broken Rose was Mr. Caro's company, Broken Rose owned 51% of R-Caro Productions and managed R-Caro's business affairs.  Therefore, Broken Rose functioned as a proxy for all business affairs for R-Caro and provided production, management and staffing for all of R-Caro's activities.  Broken Rose was reimbursed or was to be reimbursed for all overhead expenses by R-Caro.  During the period from 2004 to 2010, all projects financed by Broken Rose (with funding from R-Caro) were attributed to R-Caro regarding ownership and control.  Thus, it was not unusual for funds to be transferred to Broken Rose's account.  It was undeniably wrong for Mr. Caro to use those funds from 2009 to 2014 for personal expenses, including paying for his mortgage, investments, car lease, and family expenses.

8

sound-editing; and (3) the sales, which includes domestic and foreign distribution of the film.  For each film, two companies are formed to handle different phases.  The management company finances the film, overseeing production, overhead, and cash flow.  The manager is also responsible for the last phase, the sale and distribution of the film, foreign sales, awareness marketing, and asset value management.  A separate production company produces the film, hiring a producer to make, and oversee the making of, the film.  Typically, a producer is paid a production fee, and a manager is paid a management fee.  The financing for the production commonly derives from a loan and/or private initial investment capital.  The financing for the management company's activities beyond the physical production is either financed by revenue received from the exploitation of the film such as royalty checks and box office sales, or a subsequent investment of funds from investors.

In this case, R-Caro was both the management and production company, and Mr. Caro was both the producer and manager.  Over 5 years from 2005 to 2010, Mr. Caro worked from start to finish on two films, "Homie Spumoni" and "El Cantante" for R-Caro.  During the production phase from 2005 to 2006, Mr. Caro hired approximately 200 to 300 people, including independent contractors, actors, set designers, sound engineers, etc.  He worked 80 hour weeks and worked closely with Mr. Burkle.  After production ended, for approximately 25 weeks, Mr. Caro oversaw approximately 10 people, including film editors and sound-editors to complete the films.

During the production and post-production of "El Cantante," starring Jennifer Lopez and Marc Anthony, there was a buzz of excitement and hope of box office success among everyone involved, including Mr. Caro, Mr. Burkle, and Ms. Lopez.  When he was hired to produce "El Cantante," it was the largest budget, independent feature, film Mr. Caro had produced to date.  Mr. Caro mistakenly believed that he had "succeeded" in the entertainment industry and as early as 2005, adopted an imprudent lifestyle given the state of his finances.  Mr. Caro's financial livelihood would rise and

fall on the success or failure of the films, a common phenomenon in the entertainment industry.  As a colleague wrote:

> Life is beyond expensive in Los Angeles and pay cycles can be slow and far apart.  I can tell you that I have in the past sold heirlooms to keep the lights turned on in between gigs.  I remember [Mr. Caro] selling a car and borrowing money from me, which as I mentioned -- he promptly paid back.  I know money became tight for him.  Same thing has happened to me in the past and it is a terrible feeling when you have kids and a wife to support.

(Ex. F.)  By no means did Mr. Caro live a celebrity lifestyle commensurate with others in the entertainment industry.  However, maintaining Mr. Caro's lifestyle cost upwards of $280,000 a year, including a $142,500 annual mortgage payment for his $1.5 million house in Santa Monica,[3] a car with a lease and insurance payments of $17,000 yearly, and $45,000 a year private school tuition for his children.  Mr. Caro's excessive spending and budgeting was premature and possibly reckless but involved entirely legitimate income.

Much to everyone's dismay, "El Cantante" failed at the box office in 2007 after Mr. Caro successfully produced and distributed the film.  Everyone except for Mr. Caro walked away from "El Cantante"; Mr. Burkle was no longer interested in the film and no investor funds were deposited into R-Caro's account.  While a producer's job would have typically ended here, Mr. Caro's did not.  Obligated by contract, for the next three years from 2007 to 2010, Mr. Caro worked 60 hour weeks to distribute the film beyond the box office to recoup losses.  Distribution for television, video, and overseas can account for 85% of a film's revenue.  While it may have been prudent to walk away, Mr. Caro was blinded by his pride and his sheer determination to make this film a success.  Mr. Caro and his two employees, Cary Jones and Bianca Dohman solicited 7

---

[3]     Mr. Caro's mortgage was nearly $12,000 a month because Mr. Caro purchased the home without a down payment.

studios for distribution for television, video, and film.  To prepare for these meetings either in other states, countries, or at various film festivals, Mr. Caro and his team had to research and analyze whether their film fit into the schedule of films that a studio annually releases in order to present a pitch to the studios.  Much analysis and research goes into these reports.  Mr. Caro and his team oversaw the production of chain of title and other legal documentation to support the various distribution agreements worldwide; the music licensing and copyrights, which consisted of working with various lawyers and contracts; rights' clearance; and physical delivery and manufacturing which includes digital mastering, sound mastering, and various formats for different territories.  Essentially, Mr. Caro was engaged in every detail of the films' production and distribution.

For these two years that Mr. Caro was manager and responsible for the distribution of the film beyond the box office, he did not receive any funds from R-Caro or Yucaipa.  Mr. Caro was not paid a salary.  He had no other source of funds to pay overhead and business expenses incurred by Broken Rose for R-Caro.  Mr. Caro naively believed that investor funds would resume at some point, but they never did. He naively believed funds from overseas, video and television sales would pour in, but they never did.  Abandoned and desperate to make "El Cantante" a success, Mr. Caro maxed out his credit cards to pay for expenses related to the distribution of the film, including out-of-state travel for meetings with studio executives, lawyers, report analysis, and employee salaries.  He had no cash savings and his significant personal expenses were burying him.  Mr. Caro found himself in an untenable position:  he believed that by contract he was required to distribute the film, a job which required 60 hours a week, but he did not receive any income from R-Caro during this period to pay his mortgage and support his family and could not take on any new employment.  Mr. Caro was equally driven by his irrational personal commitment to El Cantante to make it succeed.

1    Mr. Caro blindly clung to this film because it had his name on it, he had invested

2  so much in the film already, and believed it would be a success.  In his words:

3           As an advocate of US Latin entertainment content since 1995,
           I was irrationally attached and committed to El Cantante.  Its
4           budget scope had a "too big to fail" element associated with it
           and that attachment made me blur my vision regarding the
5           reality of the project.  I was attached and defined my position
           in the market place by the film; these circumstances led me to
6           hard focus on that film and its financial success for my
           professional benefit.
7

8  (Ex. A.)  By the time Mr. Caro received the first royalty check for "Homie Spumoni"[4]

9  in the amount of $200,653 from Warner Brothers in July 2009, he owed $40,000 in

10 credit card debt, and $50,000 that he had accrued to fund the overhead of Broken Rose,

11 including management for R-Caro.  He faced foreclosure on his family's home twice in

12 2008 and 2009.  His leased car had been repossessed.  His contractual obligations to

13 distribute "El Cantante" and his tunnel vision about the potential for increased revenue

14 resulted in expenses exceeding income.  Mr. Caro felt ashamed and desperate, leading

15 him to use terrible judgment when the royalty check arrived.

16    This is not to suggest that Yucaipa was at fault for Mr. Caro's financial distress.

17 Indeed, Mr. Caro lived beyond his means and certainly admits that.  Instead of reducing

18 his living expenses back in 2007, Mr. Caro irrationally believed he could "save" "El

19 Cantante" and recoup the losses through distribution overseas and through video.

20 When it was clear that "El Cantante" was beyond saving, Mr. Caro desperately looked

21 for other opportunities to make money to make Broken Rose, R-Caro, and himself

22 whole again.  He was the perfect victim for a Ponzi fraudster named Scott Hockler,

23 who impressed Mr. Caro with his promises of quick and large returns if Mr. Caro

24 invested in his hedge fund, which unbeknownst to Mr. Caro turned out to be a complete

25

26    [4]    Warner Brothers sent royalty checks for "El Cantante" to Yucaipa but, for
27 an unexplained reason, sent royalty checks for "Homie Spumoni" directly to Mr. Caro.
   No royalty money for "El Cantante" was reinvested in R-Caro or went to pay for its
28 management.

sham.[5]  Because Mr. Caro had significant debt and no cash flow, he thought he could use funds from the royalty checks to invest in a hedge fund that would provide independent funding and cash flow to him, Broken Rose, and R-Caro.  Much of the $1.4 million dollars funded the lifestyle he created for his entire family and Hockler's "hedge fund."  Mr. Caro was too ashamed to come clean to his wife and kids so that he could reduce their personal expenses.  He also hoped that he would be able to continue his family's lifestyle without upsetting their lives.  He now recognizes how he had completely spiraled into a state of desperation and hid that from his wife.  In his words:

> Upon reflection, I can only say that I was blind to the reality of my situation and I was too cowardly to confront my own shortcomings and inform my wife of the financial crisis we were in.  Essentially, I lived a fantasy and was looking for any opportunity to finance that lifestyle.

(Ex. A; PSR ¶ 24.)

Courts have recognized significant financial pressures as a mitigating factor.  *See United States v. Patillo*, 817 F.Supp. 839 (C.D. California 1993) (defendant, at the time of committing the offense, was subject to extraordinary financial pressures such as student loans, credit cards, phone bills, rent, had no prior criminal activity, a college education and held a steady job up until he was incarcerated; there was both unusual temptation and unusual opportunity to commit the crime, and has afterwards demonstrated tremendous remorse).  This crime was out of character for Mr. Caro, a well-established, independent film producer with a college education and no criminal history.  In this particular moment of financial weakness, Mr. Caro committed the crime and has demonstrated tremendous remorse.

The defense raises Mr. Caro's unpaid work and significant business expenses for R-Caro not because Mr. Caro had a good faith belief that he was entitled to $1,487,529.

---

[5]     Scott Hockler was indicted for fraud, but not in relation to the fraudulent hedge fund he ran.  He was sentenced to 4 years in prison and died in prison in 2013.  *See* Indictment, *United States v. Hockler*, 12-CR-624-DLC.

Even though Yucaipa lost $1.4M in royalty checks, it was not completely deprived of the honest services Mr. Caro provided.  This is not a case where Yucaipa invested money for production of a movie and no movie was made.  Nor is this a case where Mr. Caro induced Yucaipa by false representations to invest in a movie that was never made.  In fact, this is very different from the run-of-the-mill fraud cases where defendants make false representations to induce investors, and the businesses or investments are complete shams.  *Compare United States v. Lyons*, 472 F.3d 1055 (9th Cir. 2007) (scheme to defraud donors to charities by making false representations), *United States v. Woods*, 335 F.3d 993 (9th Cir. 2003) (telemarketing scheme that solicited funds from victims promising the eligibility to win prizes); *United States v. Lloyd*, 807 F.3d 1128 (9th Cir. 2015) (boiler room scheme to defraud to solicit investors for two movies where telemarketers made materially false statements); *United States v. Brown*, 771 F.3d 1149 (9th Cir. 2014) (Ponzi scheme where defendant touted his investment capabilities, solicited investors for money, and no investments were ever made); *United States v. Zolp*, 479 F.3d 715 (9th Cir. 2007) (pump and dump scheme where defendant fed false information to investors to inflate the stock price while selling his own shares in the inflated market).  In comparing these cases, Mr. Caro's criminal conduct underscores an aberration from his otherwise law-abiding life.  In fact, under appropriate circumstances, even the advisory sentencing guidelines recognize the importance of conduct that is considered "aberrant."  (*See* U.S.S.G. § 5K2.20).

### D.   Cooperation and Extraordinary Acceptance of Responsibility

Mr. Caro's admission to his conduct did not start with the appointment of counsel or the plea agreement.  Rather, when Yucaipa executives contacted him two years ago on November 15, 2014, Mr. Caro confessed that he was aware of the Warner Brother's checks.  Specifically, he admitted to using the royalty checks for "various expenses associated with [his] life and the company, Broken Rose Productions."  He further admitted that "[n]one of these transfers from R-Caro to Broken were authorized, consented to or associated with R-Caro and [that he] acted on [his] own to effect these

1  transfers and payments and [is] solely responsible for disposition of those funds."  Mr.

2  Caro immediately met with Yucaipa's personnel on November 21st[6] and admitted to

3  embezzling not only the $1 million of Warner Brother royalty checks on which he was

4  questioned, but an additional $400,000 about which Yucaipa did not know.  (PSR ¶ 22.)

5  Mr. Caro readily admitted fault and was forthcoming about his situation.  As he stated

6  in his interview with Yucaipa security officials, "[h]e was simply out of money, facing

7  foreclosure on his home and took checks that should have gone to the R-Caro entity

8  and transferred them to his own production company, Broken Rose Productions.  [Mr.

9  Caro] received from Warner Brothers statements, payments and 1099s but never

10  forwarded anything on to us.  No addresses were changed, it's simply that Warner

11  Brothers had the Julio Caro address for R-Caro Productions."  Mr. Caro signed a

12  written statement confessing to theft and embezzlement.  Mr. Caro agreed to submit

13  documents so Yucaipa could verify what payments were made by Warner Brothers.

14  Mr. Caro agreed to pay Yucaipa through an agreement which entitled Yucaipa to

15  payments from not only profits, but from all income received dealing with the films and

16  television shows that were on his current agenda.  In fact, Yucaipa's legal department

17  considered this a potentially good disposition.

18      From his first confession on November 21, 2014, Mr. Caro followed-up on

19  numerous occasions with Yucaipa offering additional information, documentation, and

20  making himself available for any questions Yucaipa may have, and agreed to working

21  with law enforcement.  He hand-carried two packets of invoices, including detailed

22  financial documentation that tracked the deposits and wires, to Yucaipa on December

23  11 and 17, 2014.  On April 9, 2015, he submitted to a voluntary recorded interview

24  with FBI agents waiving his right to a lawyer.  Since his interview last year, he has

---

[6]      Mr. Caro was out of state and hospitalized for a stroke at the time of
Yucaipa's call.  As soon as he was able to fly and return to Los Angeles, he met with
Yucaipa's personnel.

apprised the FBI agents of any and all overseas travel for business despite his absolute ability and freedom to travel. He fully expected to be criminally charged. Indeed, Mr. Caro has shown extraordinary acceptance of responsibility by admitting guilt to Yucaipa and cooperating with not just Yucaipa executives, but also the FBI. Even Yucaipa executives believed him and found him cooperative from the very beginning. At the request of Mr. Caro, before this case was charged, defense counsel contacted Mr. Burkle's legal counsel, Robert Birmingham, to offer a personal apology. This gesture was important to Mr. Caro and indicates that he truly accepts responsibility for his actions. He did not apologize hoping for a response; he apologized as a further effort to prove himself accountable and to start rebuilding the integrity he had damaged.

Although initially Mr. Caro concealed his theft to Yucaipa personnel in September 2012 (PSR ¶ 14), Mr. Caro's immediate acceptance of responsibility in 2014 and his efforts to cooperate with Yucaipa and the FBI exceed acceptance of responsibility as defined in U.S.S.G. § 3E1.1. In 2012, Mr. Caro was in denial, panicked, and subsequently lied. But this is mitigated by the fact that in 2014, Mr. Caro fully confessed, admitted to additional funds he stole about which Yucaipa did not know, and significantly cooperated to build a case against himself before any law enforcement was involved. He has provided the evidence, both in documentation and in confessions both written and oral, to successfully prosecute this case with minimal governmental resources. The defense respectfully requests the Court vary downward to account for Mr. Caro's extraordinary efforts to make himself accountable and accept responsibility. Courts have given additional reductions beyond the standard two levels pursuant to § 3E1.1(a). *See United States v. Brown*, 985 F.2d 478, 482 (9th Cir. 1993) (the mere existence of § 3E1.1(a) does not preclude the sentencing court from making an additional departure in the case where the defendant manifests an extraordinary acceptance of responsibility).

16

## E.     Post-Offense Rehabilitation

Post-offense rehabilitation is a recognized ground for varying below the advisory guidelines.  *See Gall v. United States*, 552 U.S. 38 (2007); *United States v. Tzoc-Sierra*, 387 F.3d 978, 981 (9th Cir. 2004); *United States v. Green*, 152 F.3d 1202, 1208 (9th Cir. 1998).

Mr. Caro's conduct was 2 years ago.  Since then, he has admitted his wrongdoing, and has again lived a law-abiding and productive life.  He has been employed, first as a consultant with Two Wolves Films, and then as a freelancer producing commercials with Creative Film Management.  (PSR ¶ 56.)  He created a plan for supporting his children if he is incarcerated.  He has reduced his expenses drastically, including selling his house in Santa Monica and renting a smaller house in Woodland Hills, and transferring his son from private school to public school.  (PSR ¶ 58.)  He is taking a hard look at his finances and trying to find stability in a fluctuating industry so that he will not put himself in this situation again.  To begin with, he is no longer managing the production of a film in which he is responsible for the financial aspects including overhead, cash flow, and sales.  He is returning to what he does best - - physically producing films, which includes managing the creative process, the actual filming, post-production and sound editing.  His compensation will no longer be attached to the financial performance of the film he is producing.  He is currently employed as a consultant for the production company Creative Film Management and trying to find a salaried position.  (PSR ¶ 67.)

He has confessed to his family, friends, and colleagues.  (*See* Exs. B-K.)  As mentioned earlier, Mr. Caro has taken responsibility with his family.

His ex-wife writes:

> It takes tremendous courage and vulnerability to ask for forgiveness for hurting the people you love most in this world.  Watching Mr. Caro confess to our children deep regret, remorse, and devastation for his actions, I felt great respect.  I also realize that when Mr. Caro took responsibility for his actions, showed remorse, and faced the consequences head on he was being a positive role model for our children.

17

> Raising our children to be responsible and accountable for their actions is of utmost importance.   Seeing their father own-up to his mistakes models to our children that even if you make a bad choice you can ask for forgiveness and make the better choice next time.   We can learn from our mistakes and have a chance to start over.

(Ex. D.)  Mr. Caro writes:

> I felt that despite the challenges and the tears, I had revealed to my children that I was contrite for my actions and I felt that over time, I could find redemption with them and that they would remain true to the positive values I had stood for previously.   My example, I now had a greater burden to show how a man can overcome self-inflicted adversity and continue to contribute to society and be a meaningful member of a family.   I know in my heart that I have to be an even better father than before as my children become young adults.   I welcome the challenge and hope that I can write a new story for myself in the future after I have paid my debt to society.

(Ex. A.)

Mr. Caro does not need a prison sentence to persuade him of the seriousness of his conduct or to keep him law-abiding.  His criminal conduct was circumstantial and he has changed his circumstances.  Mr. Caro is capable, despite his wrongdoing, of living a productive and law-abiding life in the future.  Mr. Caro has taken concrete steps in adjusting his employment decisions and lifestyle to create a more steady financial position so that he never finds himself in the vulnerable and desperate situation that he did leading up to this offense.  Mr. Caro has begun restoring his character and integrity that will guide his moral compass.  In essence, the past two years provide the best predictor of how Mr. Caro will conduct himself going-forward.

## F.   Just Punishment and Sentencing Options --Adverse Effect on Mr. Caro's Life --- Both Personal and Professional

The events in this case have already come with heavy punishment.  Mr. Caro's physical and emotional health have suffered greatly.  Mr. Caro's career and reputation have been destroyed.  In short, the upward trajectory of his life, a life built in an industry that is unfortunately dominated by perception and popularity, is irreparably damaged.

18

First, on a personal front, Mr. Caro has suffered greatly.  On November 11, 2014, the stress of knowing his wrongdoing and of trying to salvage his marriage resulted in a stroke.  Mr. Caro was hospitalized for several days, and currently takes medication to thin his blood and to reduce his cholesterol (Clopidogrel and Atorvastatin) which is monitored every three months.  (PSR ¶ 62.)  His marriage of 22 years is over, which is a loss that cannot be measured and could not have come at a worse time for Mr. Caro.  In describing how he met the love of his life more than 24 years ago, he describes her as being funny, beautiful without being vain, and confident without being arrogant.  In Mr. Caro's words:

> Unfortunately, my actions and behavior destroyed our marriage.  Any marriage or any relationship for that matter is built in some form or manner of trust.  All Jackie ever asked of me was honesty; even when the truth was terrible or horrific.  My action surrounding R-Caro were not secret because I believed I was breaking any law; rather, my actions were the result of my inability to admit that I was not able to provide for my family financially.  And I felt shame for this.  A kind of shame that undermined my marriage and the trust embodied in that union.

> For Jackie, trust is at the core of her being.  She came to LA on the trust within our marriage.  She bore and raised children on the trust within our marriage.  And when I disclosed the R-Caro matter, all I can say is that I have never seen a person react with such profound emotion.  I saw in her eyes the devastation of having a person you love and trust betray you: I could feel on a visceral level, the destruction of our marriage.  It was a profound moment that I will never forget.  The impact went behind tears and anger; my behavior and the betrayal reached deep into her soul and extinguished any ability for her to offer any consolation.

(Ex. A.)  The couple divorced on September 12, 2016.

Equally, if not more difficult, was the moment when Mr. Caro confessed his crimes to his children.  As indicated earlier, Mr. Caro and his children have a close relationship, and they admire, adore, and love him.  It was heartbreaking for Mr. Caro to shatter his children's perception of the person who is supposed to be the more responsible, upstanding, and honest role model.  As Mr. Caro states:

> I determined early in my children's lives that I would be an

19

engaged parent and father. I was very present in their lives. While I never contemplated being an overt role model, as a parent, you cannot avoid that phenomenon for better or worse. Seeing their father plead guilty to fraud on any level will be devastating to my children because it reveals a side of a parent that one should never have to see. I fear that my actions will tear down archetypes in my children's minds and beg them to question love for a parent, right and wrong, and a parent's credibility. These aspects weigh heavy on my mind. My children are solid students and good people. They do not lie and are not misguided. I have been fortunate that my children have never had any issues with bullying, drugs or alcohol. I credit much of this to strong parenting. And here, today, their father's credibility will be shattered in a very public and shameful way. I will work very hard to take the full responsibility of my actions and to make sure that they see me as an example about what can happen if you do not adhere to the law and perhaps more importantly, that they live within their means and find happiness in having a job, a home and meaningful friendships. I will spend the rest of my life seeking their forgiveness and will try to find redemption by being a responsible father to the best of my ability.

(Ex. A; PSR ¶ 55.)

Second, on a professional front, Mr. Caro's business, career, and reputation have been impacted by this case. This case was, and will continue to be substantially publicized because of Mr. Burkle's notoriety. The publicity is devastating to Mr. Caro's reputation, especially in an industry that is competitive, saturated, and dominated by perception. As producer Scott Vogel explains:

Our profession is a tough business, it's very superficial where everyone is always "winning." Misfortune is treated like a viral contagion and not something one wants gossip to center around. Such negativity no matter how minor can prevent you from securing a deal, getting important meetings, getting hired and worst of all it can go to diminish your capabilities without having anything to do with you as a professional. Interestingly, it only gets more difficult the more you achieve.

(Ex. G.) The reputation Mr. Caro built over 30 years with his strong work ethic, passion, and commitment to excellence will be replaced with the branding of being a felon, a criminal, and a rogue producer who is untrustworthy. It will be as if everything Mr. Caro did prior to his criminal acts means nothing. Certainly, this is Mr. Caro's own fault and he fully embraces that he is solely responsible for his professional

20

1    demise.  The defense suggests, however, that this is a unique situation where the

2    publicity alone in this industry is debilitating, making it extremely difficult for Mr.

3    Caro to rebuild and rehabilitate his reputation, to which he is committed.  This is a

4    collateral but not inconsequential punishment that should be taken into consideration.

5         Individual deterrence is not a factor in this case.  Mr. Caro will no longer be in a

6    position to manage finances in the production of film.  He has already made that

7    adjustment as discussed above.  Additionally, an uncontested and recommended

8    condition of bond prohibits Mr. Caro from being "employed in any capacity wherein he

9    has custody, control, or management of his employer's funds."  (Condition #4, USPO

10   Ltr at 2.)  Likewise, another recommended condition requires Mr. Caro "to provide the

11   Probation Officer with access to any and all business records, client lists, and other

12   records pertaining to the operation of any business owned, in whole or in part, by the

13   defendant."  (Condition #5, USPO Ltr at 3.)  Mr. Caro has been in perfect compliance

14   with his bond, and there cannot be any real doubt that he will be in compliance with

15   supervision.  (PSR ¶ 8.)  Mr. Caro is humbled and humiliated by this case.  The shame

16   and dishonor of being paraded in public as a cheat and a convicted felon is

17   embarrassing for anyone in his position.

18        Certainly, Mr. Caro has no one to blame but himself.  But, the defense offers the

19   adverse effect on both his personal and professional life to illustrate that it lessens the

20   need for further deterrence and protection of the public because it already is substantial

21   punishment.  Mr. Caro's shame is so pervasive that it is clear he will never break the

22   law again.  A term of imprisonment is not necessary to impress upon Mr. Caro the

23   seriousness of his crime and/or to reduce the chances he will reoffend.

24        The defense respectfully submits that the Court can substitute one day of home

25   detention for one day of custody, and sentence Mr. Caro to 18 months of home

26   confinement, 300 hours of community service, and a term of 3 years of probation.

27   Home confinement will allow Mr. Caro to work to provide support for his children and

28   make restitution payments.  As the Probation Officer noted, "the longer the defendant is

away from the industry, the harder it will be for him to obtain work upon his return." (USPO Ltr at 5.)  Through community service, Mr. Caro can speak and mentor youth about his life and mistakes, and simultaneously punish Mr. Caro for his crime by requiring him to continuously publicly admit his wrongdoing.  Just as Mr. Caro used his life and mistakes to teach his children about the importance of accountability and the commitment to rebuild, Mr. Caro can provide valuable insight and teachings to young students.  Mr. Caro is currently arranging to guest lecture at a business school class.  This not only continues to impress upon Mr. Caro the seriousness of his conduct, but also through his teachings, can provide a deterrent effect in the public in a very real and tangible way.

## IV.    Conclusion

Mr. Caro respectfully asks this Court to impose a three year period of probation, 300 hours of community service, and an 18-month term of home confinement.


Respectfully submitted,
HILARY POTASHNER
Federal Public Defender


DATED:  October 21, 2016                By  /s/ Jennifer J. Uyeda
                                        JENNIFER J. UYEDA
                                        Deputy Federal Public Defender
                                        Attorney for JULIO CARO

22

## **PROOF OF SERVICE**

I, the undersigned, declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202, Telephone No. (213) 894-2854; that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the State of California, and at whose direction I served a copy of the attached **POSITION RE SENTENCING; EXHIBITS** on the following individual(s) by:

[ ] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows:

[ ] Placing same in an envelope for hand delivery addressed as follows:

[ ] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows:

[ ] Faxing same via facsimile machine addressed as follows:

[X] By e-mail as follows:

Adam D. Sweeney, USPO
21041 Burbank Blvd.
Suite 200
Woodland Hills, CA  91367-6609
Adam_Sweeney@cacp.uscourts.gov

This proof of service is executed at Los Angeles, California, on **October 21, 2016.**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*Sonia Casas*                          .
**SONIA CASAS**